# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| ST. THOMAS HOSPITAL, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| v. | ) | **No. 3:08-1041** |
| | ) | **Judge Echols** |
| KATHLEEN SEBELIUS, in her capacity as | ) | |
| Secretary of the United States Department of | ) | |
| Health and Human Services, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

In this action, Plaintiff St. Thomas Hospital ("St. Thomas") seeks to recover from the Defendant Secretary of Health and Human Services ("the Secretary") additional Medicare reimbursement payments for the inpatient hospital services St. Thomas furnished to certain patients for the fiscal year ending June 30, 1996. The parties have filed cross Motions for Summary Judgment (Docket Entry Nos. 34 & 42), and those Motions have been fully briefed. (Docket Entry Nos. 38, 46, 60 & 71). In addition, Adventist Health System Sunbelt, Inc. ("Adventist Health") has filed a "Motion for Leave to File Brief *Amicus Curiae*" (Docket Entry No. 57) and attaches to that Motion its brief in support of Plaintiff's position.[1]

---

[1] Having considered Plaintiff's opposition to the Motion (Docket Entry No. 63) and Adventist's reply (Docket Entry No. 66), the Court will grant Adventist Health's Motion for Leave and has considered its attached brief in formulating this Memorandum.

1

# I.  FACTUAL, REGULATORY AND PROCEDURAL BACKGROUND

St. Thomas is an acute care hospital and licensed Medicare provider in Nashville, Tennessee. Among other things, St. Thomas provides inpatient medical care to TennCare patients.  At issue in this case is the amount of reimbursement St. Thomas received for the inpatient care provided to TennCare recipients for the fiscal year ending June 30, 1996.

Plaintiff's complaint in this case is that it was not properly reimbursed by the Secretary for the 1996 fiscal year because inpatient days for TennCare patients were not included in the calculation utilized by the fiscal intermediary acting on behalf of the Secretary.[2]  In response, the Secretary argues that Plaintiff's position on the merits is incorrect and, more fundamentally, that this Court lacks jurisdiction because Plaintiff did not exhaust its administrative remedies and that, even if this Court had jurisdiction, Plaintiff is collaterally estopped from challenging the 1996 determination.  To place the parties' arguments in context, the Court will discuss the regulatory framework, the administrative process and proceedings in this case, and Plaintiff's prior challenges to the reimbursement scheme.

## A.  Regulatory Background

Medicare is a federal health insurance program that provides payments for medical services for elderly and disabled persons. 42 U.S.C. §§ 1395, *et seq*.  Reimbursement of the costs of inpatient hospital services under Medicare is governed by the Prospective Payment System ("PPS"), 42 U.S.C. § 1395ww(d).  Under the PPS, payments are not based on the hospital's actual costs of treating Medicare patients, but rather on  a predetermined amount for each patient depending on the

---

[2]A fiscal intermediary is an insurance carrier that contracts with the Department of Health and Human Services to review, process, and pay Medicare claims.

2

patient's diagnosis at time of discharge, 42 U.S.C. § 1395ww(d)(1)-(4); 42 C.F.R. Part 412, with the presumption being that the predetermined amount should be adequate to cover the cost for inpatient services if a given hospital is run efficiently.

In 1983, Congress determined that hospitals serving a disproportionately large number of low-income patients incurred greater costs and those costs were not being met by the standard PPS calculations. Accordingly, Congress authorized the Secretary to provide an adjustment for hospitals serving a disproportionate share of low-income patients. This adjustment is called the Medicare disproportionate share hospital ("DSH") adjustment. See 131 Cong. Rec. S10931. Thereafter, in 1986, Congress passed the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), Pub. L. No. 99-272 (1986), which included a provision creating and defining the Medicare DSH adjustment and setting forth the formula for calculating that adjustment.

Whether a hospital qualifies for the DSH adjustment, and how large an adjustment it receives if it does qualify, is determined by the hospital's "disproportionate patient percentage." A hospital qualifies for a Medicare DSH adjustment if its "disproportionate patient percentage" meets or exceeds levels specified in 42 U.S.C. § 1395ww(d)(5)(F)(v). Those levels are determined by fractions expressed as percentages.

The first fraction, known as the "Medicare fraction" or "Medicare Low Income Proxy" involves a calculation of the number of "patient days" that a hospital spends serving patients who are entitled to Medicare Part A benefits and Supplemental Security Income. 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). That fraction is not at issue in the case.

The second fraction, which is at issue in this case, is known as the "Medicaid fraction" or "Medicaid Low Income Proxy." The Medicaid fraction is defined as follows:

the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX of this chapter [i.e., the Medicaid program], but who were not entitled to benefits under part A of this subchapter [i.e., the Medicare program], and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).  Obviously, the more patient days which are included in the

numerator of the Medicaid fraction, the higher a hospital's DSH percentage. Conversely, if patient

days are excluded from the numerator of the Medicaid fraction, a hospital's DSH percentage will

fall and the hospital will receive less reimbursement from the federal government.

At this point, it is necessary to note the distinction between Medicare and Medicaid.  The

Medicaid program, which is codified in Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et*

*seq.*, is a cooperative federal-state program designed to provide health care benefits to indigent

persons who are aged, blind, disabled, or members of families with dependent children. 42 U.S.C

§ 1396, et seq.  To participate in the Medicaid program, a state must submit to the Secretary a "plan

for medical assistance" that meets federal guidelines and identifies the categories of individuals who

will receive medical assistance under the plan and the specific kinds of medical care and services

that will be covered by the plan.  In order to receive matching federal funds, the plan must be

approved by the Secretary.  42 U.S.C. § 1396a.

While states have some leeway and flexibility in crafting a plan, there are limitations under

the Medicaid statute, such as the income and resource limits for eligible recipients.  Nevertheless,

to encourage states to create innovative programs that are likely to assist in providing medical

assistance to low income individuals, Section 1115 of Title XIX, 42 U.S.C. § 1315, authorizes the

4

Secretary to waive certain provisions of the Medicaid statutes. Such programs are known as Section 1115 "demonstration projects" or "waiver programs."

The Secretary may approve a demonstration project if, "in the judgment of the Secretary," the demonstration project is "likely to assist in promoting [Medicaid] objectives." 42 U.S.C. § 1315(a). A demonstration project may provide benefits to individuals who do not otherwise qualify under the Medicaid statute, or may provide benefits not otherwise authorized by the Medicaid statute because the "Secretary may waive compliance with any of the requirements of section . . . 1396a," such as the income limits. 42 U.S.C. § 1315(a)(1). Individuals who are not eligible for medical assistance under a Medicaid state plan approved under Title XIX, but who are eligible for benefits under a demonstration project approved under section 1115, are referred to as "expansion waiver populations" or "expansion populations."[3] The patient days associated with the inpatient care of expansion waiver populations are sometimes referred to as "expansion waiver days."

TennCare is a state demonstration project for eligible participants in Tennessee and the central issue in this case relates to payment for the days St. Thomas spent treating such patients. St. Thomas claims that the expansion waiver days attributable to TennCare patients were excluded improperly from St. Thomas' Medicare DSH calculation for the 1996 cost report year. St. Thomas' position is that the days spent by it in providing treatment to TennCare patients must be included in the Medicare DSH calculation because TennCare was the vehicle through which Tennessee provided medical assistance to its indigent populations and TennCare was approved by the Secretary to be part of the Medicaid program under Title XIX. In other words, St. Thomas takes the position

---

[3]These patients are called "expansion" populations because the size of Medicaid's blanket of coverage is expanded, by virtue of the waiver granted by the Secretary under 42 U.S.C. § 1315.

5

that because TennCare patients receive benefits under Section 1115, those patients are entitled to be treated as if they were eligible for medical assistance under Title XIX. The Secretary takes the position that this argument is not supported by the text of either the Medicare DSH provision or the Social Security Act demonstration project provision, nor is it supported by the relevant legislative history, and, in fact, was expressly repudiated by Congress in the Deficit Reduction Act of 2005. The parties' arguments necessitate an overview of how DSH calculations have been treated over the years.

Prior to 2000, Section 1115 days for purposes of the Medicare DSH calculation were treated inconsistently by fiscal intermediaries, with some including the expansion waiver population in the DSH adjustments, and others not including those populations.[4] In an effort to rectify the differing treatment, the Secretary, on January 20, 2000, issued an interim final rule. That rule indicated that "[u]nder current policy . . . [p]atient days of the expanded eligibility groups . . . were not to be included in the Medicare DSH calculation." 65 Fed. Reg. 3136 I B. The new rule, however, allowed "hospitals to include the patient days of all populations eligible for Title XIX matching payments in a State's section 1115 waiver in calculating the hospital's Medicare DSH adjustment." 65 Fed. Reg. 3135. In other words, hospitals were now allowed to include expansion populations

---

[4]The Secretary claims that prior to 2000, it was the Department of Health and Human Services' policy to exclude Section 1115 days from the Medicare DSH calculation. St. Thomas argues that this contention is false because many hospitals in states with approved Section 1115 expansion waivers received Medicare DSH payments reflecting the inclusion of expansion population patient days. Regardless of whether it was a policy or not, as will be shown in the legal discussion, *infra*, some hospitals in states with approved Section 1115 waivers received Medicare DSH payments, while others did not.

in the Medicare DSH adjustment.  However, the revised policy was to be "effective with discharges occurring on or after January 20, 2000[.]"[5]

In 2005, Congress enacted the Deficit Reduction Act.  Section 5002(a) of the Act contains a provision dealing with the Medicare DSH statute which provides:

> (a) IN GENERAL.—Section 1886(d)(5)(F)(vi) of the Social Security Act (42 U.S.C. 1395ww(d)(5)(F)(vi)) is amended by adding after and below subclause (II) the following:
>
> "In determining under subclause (II) the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under title XIX, the Secretary may, to the extent and for the period the Secretary determines appropriate, include patient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project approved under title XI."

Deficit Reduction Act § 5002(a).  The Act also ratified prior actions of the Secretary in relation to DSH adjustments and, specifically, the January 20, 2000 regulation.  Id. § 5002(b).  The Act further provided that it had no application to closed reports and was not to be construed "in a manner that requires the reopening of any cost reports which are closed as of the date of the enactment of this Act."  Id.

**B.  Administrative Procedures and the Administrative Proceedings in this Case**

At the close of each fiscal year, a provider is required to file a Medicare cost report with its fiscal intermediary.  42 C.F.R. §§ 405.1801(b), 413.24(f).  The fiscal intermediary reviews the cost report and makes a final determination of the total amount of reimbursement owed by Medicare.

---

[5]Based upon the Secretary's experience with the 2000 rule, the Secretary in 2003 issued another proposed interim rule which basically addressed certain Section 1115 demonstration projects which had benefits packages much broader than Medicaid state plans and involved patients with significantly higher income than traditional Medicaid beneficiaries.  This interim rule took effect October 31, 2003, but appears to be of limited relevance in this case.

42 C.F.R. § 405.1803. Within 180 days of the determination as set forth in the Notice of Program Reimbursement ("NPR"), the provider may request a hearing before the Provider Reimbursement Review Board ("PRRB"), so long as the amount in controversy is at least $10,000. 42 U.S.C. § 1395oo(a). The PRRB can affirm, modify, or reverse a final determination of the fiscal intermediary and that decision is the final agency action unless the Secretary takes other action. Providers have the right under the statute to seek judicial review of the final agency decision in federal district court. Id.

When a provider does not file a timely appeal of the NPR, the NPR is considered finalized. 42 C.F.R. § 405-1807. Nevertheless, within three years of the NPR, the fiscal intermediary may reopen "findings on matters at issue in a determination or decision" based upon its own initiative, or at the request of the provider. Such a reopening may lead to a revised NPR and, if such a revised NPR is issued, the provider may appeal that determination to the PRRB. However, any matters that are not specifically revised may not be appealed. 42 C.F. R. § 405.1998(b).

In this case, the fiscal intermediary issued an NPR on September 28, 1998 for St. Thomas' fiscal year 1996, and St. Thomas did not appeal any provision of the cost report.[6] However, in letters dated September 21, 2001, and September 23, 2001, St. Thomas requested a reopening of its Medicare cost report for the period ending June 30, 1996, and requested that its reimbursement for that year "include Medicaid eligible days in the Medicare disproportionate share adjustment (DSH) calculation which had previously been omitted from the cost reports." (Docket Entry No. 44 Ex. 2).

---

[6]The facts relating to the administrative proceedings are drawn primarily from "Defendant's Statement of Undisputed Material Facts" and the exhibits filed in support thereof, (Docket Entry No. 44), to which Plaintiff did not respond in opposition. Under Local Rule 56.01(g), a failure to respond to a statement of fact means that the asserted fact is not disputed for purposes of summary judgment.

8

The request included both Medicaid eligible but unpaid days, and also additional waiver (Section 1115) days in the DSH reimbursement calculation. On June 8, 2004, the fiscal intermediary granted Plaintiff's request to reopen the issue of Medicaid unpaid days and subsequently issued a revised NPR, dated June 16, 2004, reflecting the inclusion of unpaid Medicaid eligible days. However, the fiscal intermediary denied Plaintiff's request for reopening of the issue of section 1115 waiver days. (Id. Ex. 1).

On December 1, 2004, Plaintiff requested a hearing with the PRRB based on its June 16, 2004 revised NPR. Plaintiff subsequently requested "expedited judicial review" pursuant to 42 U.S.C. § 1395oo(f)(1) which allows the PRRB to certify that it lacks the authority to decide "a question of law or regulations relevant to the matters in controversy." 42 U.S.C. § 1395oo(f)(1). That request was granted on September 5, 2008, and this case was filed on October 28, 2008.

### C. St. Thomas' Prior Challenge to the Exclusion of TennCare Days

As indicated, this case involves St. Thomas' challenge to Medicaid reimbursement for its fiscal year ending June 30, 1996. However, the same issue presented in this case involving fiscal years ending June 30, 1997 and June 30, 1999 was litigated by St. Thomas in the District of Columbia in conjunction with sixteen other hospitals which sought to have patient days attributable to Section 1115 expansion waiver populations included in the Medicaid fraction of the Medicare DSH calculation for pre-January 20, 2000 cost years.

Initially, the plaintiffs were successful in the District of Columbia litigation because the district court in Cookeville Reg'l. Med. Ctr. v. Leavitt, 2005 WL 3276219 (D.D.C. 2005) ("Cookeville I") determined that Congress intended the Medicare DSH calculation to include the expansion waiver populations that received benefits through a demonstration projection. However,

9

while that decision was on appeal, Congress passed the Deficit Reduction Act prompting the Secretary to file a motion to alter or amend. Upon consideration of that motion, the district court ruled that the Deficit Reduction Act clarified the law and ratified the Secretary's prior policies regarding the exclusion of the expansion waiver population. Therefore, the district court held that were the case to be remanded from the court of appeals, the district court would grant the Secretary's motion to alter or amend judgment and enter judgment in the Secretary's favor. Cookeville Reg'l. Med. Ctr. v. Leavitt, 2006 WL 2787831 at *8 (D.D.C. 2006)("Cookeville II"). On appeal, the United States Court of Appeals for the District of Columbia affirmed the decision in Cookeville II, holding that the Deficit Reduction Act clarified existing legislation and ratified the Secretary's discretionary authority to exclude the expansion waiver from the DSH adjustment. Cookeville Reg'l. Med. Ctr. v. Leavitt, 531 F.3d 844, 849 (D.C. Cir. 2008)("Cookeville III").

## II. STANDARD OF REVIEW

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." Ferro Corp. v. Cookson Group, PLC, 585 F.3d 946, 949 (6th Cir. 2009). A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the Court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248

10

(1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. APPLICATION OF LAW

St. Thomas moves for summary judgment on the grounds that it was not properly reimbursed for fiscal year 1996 because the DSH adjustment improperly excluded patient days for which patients were eligible for medical assistance under TennCare. For that claim to even be considered, however, St. Thomas must surmount the Secretary's argument that this Court lacks jurisdiction over its claim and that St. Thomas is collaterally estopped from presenting its claim in light of the adverse ruling in Cookeville III.

### A. Jurisdiction

St. Thomas invokes this Court's jurisdiction under Title XVIII of the Social Security Act, 42 U.S.C. § 1395oo(f). (Complaint ¶ 3). That statute provides for judicial review of final Medicare

11

provider reimbursement decisions in accordance with the Administrative Procedure Act, 5 U.S.C. § 701 et seq. 42 U.S.C. § 1395oo(f)(1).

The Secretary first moves for summary judgment on the grounds that this Court lacks jurisdiction over this case. In making the argument, the Secretary notes that on September 28, 1998, the fiscal intermediary issued its NPR. That NPR did not include Section 1115 days in the calculation of St. Thomas' DSH adjustment, nor did it include the Medicaid eligible but unpaid days. St. Thomas did not appeal that decision within 180 days. Instead, it waited almost three years to request that the fiscal intermediary reopen the NPR to include Section 1115 days, as well as Medicaid eligible but unpaid days. The fiscal intermediary acquiesced with regard to the Medicaid eligible but unpaid days, but declined to reconsider reimbursement for the Section 1115 days. Thereafter, the fiscal intermediary issued a revised NPR which included reimbursement for Medicaid eligible but unpaid days.

None of these facts are disputed by St. Thomas. What is disputed is the impact those facts have on the viability of St. Thomas' present claim.

The Secretary asserts, and St. Thomas agrees, that judicial review of a PRRB decision that involves a revised NPR is generally limited to the scope of the revisions. See, Anaheim Mem. Hosp. v. Shalala, 130 F.3d 845, 848 (9th Cir. 1997). Given this general rule, the Secretary argues that St. Thomas' present claim is jurisdictionally defective because the Section 1115 waiver days were not within the scope of the revision and, indeed, were rejected from reconsideration by the fiscal intermediary. See, Foothill Presbyterian Hosp. v. Shalala, 152 F.3d 1132, 1136 (9th Cir. 1998)(collecting cases)("regulations clearly limited a hospital's right to appeal a reopening decision to the specific issues reopened and addressed in a second revised NPR").

12

St. Thomas asserts that regardless of how its request for reopening was characterized by the fiscal intermediary, this Court has jurisdiction. To set forth the true essence of St. Thomas' argument on this score, the Court quotes it verbatim:

> The reason jurisdiction exists over the revised NPR is because the Medicare statute identifies one, and only one, category of patient day that can be included in the numerator of the Medicaid proxy, and that patient day is neither "paid" nor "unpaid" nor the subject of "section 1115," but instead, simply, a day for which the patient was "eligible for medical assistance under a State plan approved under title XIX." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). Although it is true that intermediaries and hospitals will occasionally speak of "paid" days, "EBUDs,"[7] or "section 1115 days" for analytical purposes, these are all simply days for which patients are "eligible for medical assistance under a State plan approved under title XIX." Every other categorization referenced by the Secretary is an artificial overlay on the Medicare DSH calculation that is invisible to the Medicare DSH statute. A patient is either "eligible for medical assistance under Title XIX" or the patient is not. As a matter of law, that was the only legal issue before the intermediary when it issued the revised NPR—how many Medicaid days to include—and that is the exact same issue before the court in the present litigation. If the patient is eligible for Medicaid, the corresponding days of inpatient care are included in the Medicare DSH calculation. Id. If the patient is ineligible, the corresponding days are excluded. Id.

(Docket Entry No. 60 at 13).

A recent decision of the United States Court of Appeals for the Seventh Circuit suggests that St. Thomas is reading both the scope of the Medicaid statute and the regulations regarding review of revised NPRs too broadly. In Little Co. of Mary Hosp. v. Sebelius, 587 F.3d 849 (7th Cir. 2009), the fiscal intermediary issued an initial NPR for fiscal year 1998 on September 12, 2000. The hospital did not appeal that NPR, but instead submitted a request for reopening of the NPR regarding the calculation of the Medicaid Fraction and the SSI fraction.[8] The fiscal intermediary issued a

---

[7]"EBUDS" is an acronym for "Medicaid eligible but unpaid days."

[8]The "SSI" fraction is defined as "the number of hospital patient days for patients entitled to benefits under both Medicare Part I and the SSI program[,]" id. at 851 n.2, and is a part of the Medicare fraction. Little Co. of Mary Hosp. v. Leavitt, 2008 WL 5211034 at *1 (D.D.C. 2008).

13

Notice of Reopening which indicated that the hospital had requested a reopening to "include Medicaid Additional Eligible Days," but no mention was made of reopening the SSI fraction. The fiscal intermediary then issued a revised NPR with an adjusted Medicaid fraction. The hospital appealed the revised NPR, challenging both the revised Medicaid fraction and the failure to revise the SSI fraction. The PRRB dismissed the SSI fraction claim because it had no jurisdiction over that issue because it was not a part of the reopened proceedings.

The hospital then filed suit in federal court challenging the PRRB's jurisdictional determination about the SSI fraction. The district court granted summary judgment in favor of the Secretary because the evidence in the record supported the conclusion the fiscal intermediary did not reopen the SSI fraction and, therefore, neither the PRRB nor the federal district court had jurisdiction over the SSI fraction issue.

On appeal to the Seventh Circuit, "[t]he parties agree[d] that whether the district court properly granted summary judgment hinge[d] on whether the Intermediary reopened the SSI Fraction when it reopened the Medicaid Fraction." Id. at 854. The Seventh Circuit noted that a fiscal intermediary's "decision to reopen an annual report is issue specific" and rejected the hospital's assertion that a court should consider all items challenged by the provider to be reopened if the fiscal intermediary reopens any issue challenged by the provider. Id. at 854.

Given that the decision of whether to reopen an annual report is "issue specific," the Court rejects St. Thomas' overarching theme that because the Medicare statute identifies one category of patient days that can be included in the numerator for the Medicaid proxy, this Court has jurisdiction over the Section 1115 waiver days, notwithstanding the fiscal intermediary's decision to reopen only

14

the Medicaid eligible but unpaid days.  As was cogently explained by the district court in the <u>Little</u>

<u>Company Mary Hospital</u> case:

> . . . The Medicaid fraction and the SSI fraction are both components of the disproportionate share hospital payment adjustment calculation, but the disproportionate share hospital payment adjustment is complicated and broad enough to warrant its subdivision.  As <u>Anaheim Memorial Hospital</u>[9] makes clear, reopening one of the components does not amount to reopening all of the components.  The Intermediary's reopening of the Medicaid fraction issue does not grant the PRRB jurisdiction over the SSI fraction issue.  Moreover, there is a significant interest in finality involved in the instant case.  The U.S. Supreme Court stated clearly that "[t]he right of a provider to seek reopening exists only by grace of the Secretary, and the statutory purpose of imposing a 180-day limit on the right to seek Board reviews of NPRs, see 42 U.S.C. 1395oo(a)(3), would be frustrated by permitting requests to reopen to be reviewed indefinitely." <u>Your Home</u>, 525 U.S. at 454[10] . . . A plaintiff, who does not make use of its opportunity to appeal, "may not use a reopening of its cost report on an unrelated issue to walk through the statute of limitations on its appeal of [another factor]." <u>Anaheim Mem. Hosp.</u>, 130 F.3d at 852.  Plaintiff here did not take advantage of its appeal rights within the 180 days allowable under the Medicare Act.  Having left the decision to reopen the SSI fraction issue with the Intermediary, Plaintiff cannot now complain that the Intermediary chose not to reopen it.

<u>Little Co. of Mary Hosp. v. Leavitt</u>, 2008 WL 5211034 at *5 (N.D. Ill. 2008).

In this case, the fiscal intermediary issued the NPR on September 28, 1998, which St.

Thomas did not challenge within 180 days.  Instead, it chose to seek a reopening of the NPR and,

in doing so, took the chance that the NPR would not be reopened, or that it would be reopened with

respect to the Medicaid eligible but unpaid days, the Section 1115 waiver days, or both.  Having

done so, Plaintiff cannot complain about the fiscal intermediary's decision to reopen only the

Medicaid eligible but unpaid days and this Court is without jurisdiction over St. Thomas' Section

1115 waiver days claim.

---

[9]<u>Anaheim Mem. Hosp. v. Shalala</u>, 130 F.3d 845 (9th Cir. 1997).

[10]<u>Your Home Visiting Nurse Servs., Inc. v. Shalala</u>, 425 U.S. 449 (1999).

15

**B. Collateral Estoppel**

Even if this Court has jurisdiction over St. Thomas' claim involving Section 1115 waiver days for which it was not reimbursed, St. Thomas is estopped from pursuing that claim at this time. This is because the exact same issue was addressed and decided in the District of Columbia Cookeville litigation with respect to the fiscal years ending June 30, 1997 and June 30, 1999.

Collateral estoppel, which is sometimes referred to as issue preclusion, bars the subsequent relitigation between the same parties of a fact or issue where that fact or issue was fully litigated in a previous case. Cincinnati Ins. Co. v. Beazer Homes Invest., Inc., 2010 WL 374735 at *2 (6th Cir. 2010). "Four specific requirements must be met before collateral estoppel may be applied to bar litigation of an issue: (1) the precise issue must have been raised and actually litigated in the prior proceedings; (2) the determination of the issue must have been necessary to the outcome of the prior proceedings; (3) the prior proceedings must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding." Cobbins v. Tenn. Dept. of Transp., 566 F.3d 582, 589-90 (6th Cir. 2009).

Each of the four factors exist in this case. The issue in this case deals with whether St. Thomas should have been reimbursed for Section 1115 waiver days and the "central issue" in Cookeville was "whether the expansion waiver population should be counted in determining a hospital's medicaid reimbursement." Cookeville III, 531 F.3d at 846. That issue, being "central" to the case was undoubtedly necessary to the resolution of the case and a final judgment was reached on the merits of the issue. Finally, St. Thomas had a full opportunity to litigate the issue of

16

reimbursement for Section 1115 waiver days, not only initially in the district court, but also in relation to the Secretary motion to alter or amend, and on appeal.

In this case, St. Thomas does not dispute that the same legal issue was presented in Cookeville and that the issue was resolved by way of a final judgment after St. Thomas had a full and fair opportunity to present its position. Nevertheless, St. Thomas claims that issue preclusion does not apply because it has a right under the Medicare statute to appeal for each cost report year and the District of Columbia litigation did not involve its claim for the fiscal year ending June 30, 1996. St. Thomas posits that collateral estoppel or issue preclusion is a creature of common law and points to cases such as City of Milwaukee v. Illinois and Michigan, 451 U.S. 304, 314 (1981) which indicate that when Congress addresses an issue by statutory proclamation, the statute trumps federal common law.

Merely because Congress enacted a statute which allows for yearly challenges does not mean that Congress intended thereby to preclude the defense of collateral estoppel. Consider, for example, taxes which are levied on an annual basis and "each year is the origin of a new liability and a separate cause of action." Comm'r v. Sunnen, 333 U.S. 591, 598 (1948). Nevertheless, collateral estoppel can be applied to such cases where the same issue has previously been decided, even though the calendar year in dispute is different. See, Amnex, Inc. v. United States, 384 F.3d 1368, 1371 (Fed. Cir. 2004)(just because the tax years at issue were different "is irrelevant" where "the issues presented to us on appeal are identical" to those decided previously); Arkla, Inv. v. United States, 37 F.3d 621, 625 (Fed. Cir. 1994)(utility company was collaterally estopped from bringing claims for tax credit and depreciation deductions relating to 1981 tax year where same issue was

17

previously resolved in relation to 1980 tax year and there was no doctrinal change in the law or material factual differences as between the two years).

In this regard, St. Thomas' reliance on <u>Kosinski v. Comm'r</u>, 541 F.3d 671 (6th Cir. 2008) is misplaced. There, the Sixth Circuit held that a district court's determination at a sentencing hearing regarding the loss attributable to the taxpayer's conduct did not bar the tax court from determining the amount of the taxpayer's underpayment in a subsequent deficiency determination. However, in deciding issue preclusion did not apply, the Sixth Circuit pointed out that (1) the precise issues were different as between the two proceedings because the district court at sentencing dealt with the aggregate amount of tax loss for several years, whereas the tax court dealt with only one tax year; (2) the sentencing court's factual findings on the amount of loss was not essential to its judgment because it was not an element of the crime of conviction; (3) no final judgment existed in the criminal case at the time of the tax proceedings; (4) the government was not provided with a full and fair opportunity to litigate the tax loss issue at the sentencing hearing; and (5) the burden of persuasion in the two proceedings was different. <u>Kosinski</u> simply does not help St. Thomas in light of the fact that it had a full and fair opportunity to litigate the reimbursement issue for Section 1115 waiver days in the District of Columbia proceedings and the exact same issue is presented in this case.

St. Thomas next argues that issue preclusion does not apply because of the exception for "unmixed questions of law." The Supreme Court has recognized an exception to the applicability of collateral estoppel for "unmixed questions of law" which arise in "successive actions involving unrelated subject matter." <u>Montana v. United States</u>, 440 U.S. 147, 162 (1979). In <u>United States v. Moser</u>, 266 U.S. 236 (1924), the Supreme Court explained:

> Where, for example, a court in deciding a case has enunciated a rule of law, the parties in a subsequent action upon a different demand are not estopped from insisting that the law is otherwise, merely because the parties are the same in both cases. But a fact, question or right distinctly adjudged in the original action cannot be disputed in a subsequent action, even though the determination was reached upon an erroneous view or by an erroneous application of the law.

Id. at 242.

While the Supreme Court has indicated that such an exception to collateral estoppel exists, it has also been "frank to admit uncertainty as to its application." United States v. Stauffer Chem. Co., 464 U.S. 165, 171 (1984). "This exception is of particular importance in constitutional cases," Montana, 440 U.S. at 162, and "seems to require a determination as to whether an 'issue of fact' or an 'issue of law' is sought to be relitigated and then a determination as to whether the 'issue of law' arises in a successive case that it is so unrelated to the prior case that relitigation of the issue is warranted." Stauffer Chem. Co., 164 U.S. at 171. Regardless, the exception is to be narrowly construed:

> [W]hen the claims in two separate actions between the same parties are the same or are closely related . . . it is not ordinarily necessary to characterize an issue as one of fact or of law for purposes of issue preclusion. . . . In such a case, it is unfair to the winning party and an unnecessary burden on the courts to allow repeated litigation of the same issue in what is essentially the same controversy, even if the issue is regarded as one of "law."

Id. Where the legal issue is identical and the factual settings are closely related "the exception simply does not apply." Beverly Health and Rehab. Serv.'s Inc. v. N.L.R.B., 317 F.3d 317, 323 n.2 (D.C. Cir. 2003).

In this case, St. Thomas argues that the exception to collateral estoppel for "unmixed questions of law" should apply because the demands between this case and the Cookeville litigation are not "temporally aligned" inasmuch as the claims involve different fiscal years and therefore

different NPRs, different patients, different patient days, different administrative proceedings, and the like. However, to employ the exception in this case would be to allow the exception to swallow the rule because the exact same legal issue is involved and the number of patients, patient days, etc., is simply irrelevant to the determination of whether St. Thomas should have been reimbursed for Section 1115 waiver days. See, National R.R. Pass. Corp. v. Pennsylvania Pub. Util. Comm., 288 F.3d 519, 530 (3d Cir. 2002)(emphasis in original, citation omitted)("estoppel should be applied unless the 'issue of law' arises in a successive case that is so *unrelated* to the prior case that relitigation is warranted"): Burlington Northern R.R. Co. v. Hyundai Merchant Marine Co., 63 F.3d 1227, 1237 (3d Cir. 1995)("A party cannot satisfy the 'substantially unrelated claim' test where 'the same general legal rules govern both cases and . . . the facts of both cases are indistinguishable as measured by those rules'").

In sum, the Court is of the view that St. Thomas' present claim is a rehashing of the same claim that was fully and fairly litigated to final judgment in the Cookeville litigation. As such, even assuming that this Court has jurisdiction, St. Thomas is collaterally estopped from pursuing its present claim.

## C. **Merits of St. Thomas' Claim**

Even if the St. Thomas is not collaterally estopped from presenting its claim, the claim fails on the merits. Stripped to its essence, the core of St. Thomas' argument on the merits is that Cookeville III was wrongly decided. St. Thomas submits that prior to the Deficit Reduction act, the statute required Medicaid days to be included in the Medicare DSH calculation and no special exception was afforded for individuals who obtained Medicaid benefits under a state Medicaid plan approved under Title XIX as a result of a Section 1115 waiver. In other words, prior to the Deficit

Reduction Act, the DSH adjustment was to be partially based on the total number of days the hospital spent providing treatment to low-income patients eligible for assistance under a state plan (here TennCare). St. Thomas also submits that in enacting the Deficit Reduction Act, Congress did not intend to apply it retroactively to remove the requirement that expansion waiver days be included in the DSH calculation. This Court has considered all of the nuances of St. Thomas' arguments and is not persuaded that Cookeville III was wrongly decided, or that St. Thomas is entitled to the reimbursement it seeks.

It is true, as St. Thomas points out, that the Ninth Circuit in Portland Adventist held that, under the relevant statutes, the Secretary was required to include the expansion waiver population in the DSH adjustment. Indeed, the Tennessee hospitals (including St. Thomas) in Cookeville III relied heavily on that decision, but the District of Columbia Circuit found that the "the law was not as clear as the Ninth Circuit thought it to be." Cookeville III, 531 F.3d at 848. The court in Cookeville III then spent a good deal of its opinion explaining why it differed with the Ninth Circuit and concluded that, at least until enactment of the Deficit Reduction Act, it was, at a minimum, unclear whether the Secretary had discretion to exclude the expansion waiver population from the DSH adjustment. Id. at 848-49.

Moreover, Portland Adventist and Cookeville I (on which St. Thomas also relies) were cases decided prior to the enactment of the Deficit Reduction Act. As indicated, Section 5002(a) of the Act contains a provision dealing with the Medicare DSH statute which provides that "the Secretary may, to the extent and for the period the Secretary determines appropriate, include patient days of patients . . . who . . . receive benefits under a demonstration project approved under title XI." Deficit Reduction Act § 5002(a). Obviously, the fact that the Secretary "may" to the extent she

21

"determines appropriate" include certain patient days evidences that the Secretary has discretion. The issue thus becomes whether what is now clearly discretionary power should be deemed retroactive.

As a general rule, a court applies the law in effect at the time of its decision, which in this case would include the clearly discretionary language of the Deficit Reduction Act. However, because the Act was passed after the events which gave rise to this suit, St. Thomas asserts that the Act should not be applied retroactively to its claim for reimbursement for the fiscal year ending June 30, 1996.

"A statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment or upsets expectations based in prior law." Langraf v. USI Film Products, 511 U.S. 244, 269 (1994). "Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment." Id. at 269-70.

The Sixth Circuit has indicated that in deciding whether a statute should be applied retroactively, the court first asks whether the statute expressly provides that it is to be applied retroactively and, if so, that is usually the end of the inquiry. Moses v. Providence Hosp. and Med. Ctr., 561 F.3d 572, 583-84 (6th Cir. 2009). If the statute is silent on the issue, however, the court asks whether applying the statute "would have a retroactive consequence in the disfavored sense of affecting substantive rights, liabilities, or duties on the basis of conduct arising before its enactment." Id.

In this Court's view, Congress intended for the language in the Deficit Reduction Act relating to the DSH adjustment to be applied retroactively. To begin with, Section 5002 is captioned "Clarification of Determination of Medicaid Patient Days for DSH Computation." As the district

22

court in Cookeville II pointed out, titling Section 5002 as a "'clarification' is strong evidence of its retroactive effect" because "[a] clarification is a statement of 'what [Congress] believed the law already was, and thus to be applicable to all cases, past, present and future." Cookeville II, 2006 WL 2787831 at *7.

Further, the Act included express ratification of the Secretary's past regulations, including the regulations promulgated on August 1, 2003 and January 20, 2000. True, and as St. Thomas argues, the ratification language speaks in terms of regulations which were enacted after the patient days at issue in this case. However, Section 5002's ratification provisions encompass those patient days because the ratification specifically "includ[es] the policy in such regulations regarding discharges occurring prior to January 20, 2000." Deficit Reduction Act § 5002(b)(3)(A). As noted previously, the Secretary's policy, at least with respect to TennCare patient days, was to exclude such days from the DSH adjustment. See, Cookeville II, 2006 WL 2787831 at *7 (rejecting same argument as presented by St. Thomas in this case); Cookeville III, 531 F.3d at 849 (Congress ratified the Secretary's earlier policies including those relating to discharges which occurred prior to January 20, 2000). Thus, the Court concludes that Section 5002 of the Deficit Reduction Act, by its very terms, was intended to be applied retroactively.

Even if Congress' intent were unclear, this would not necessarily mean that Section 5002 has no retroactive application. While there is a presumption against applying laws which are enacted after the events giving rise to the suit, that presumption arises where the "new statute[] would have a genuinely retroactive effect." Landgraf, 511 U.S. at 277. As the Supreme Court made clear in Landgraf, a statute has an impermissibly retroactive effect only where it

> attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates "retroactively" comes at the end of a

23

process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event. . . . [F]amiliar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance.

Id. at 270.

The factors set forth in Landgraf – fair notice, reasonable reliance, and settled expectations – counsel against the conclusion that application of Section 5002 would have an impermissible retroactive effect in this case. Even prior to the Deficit Reduction Act, it was far from a given that the expansion waiver population would be included in St. Thomas' DSH adjustment. As the court in Cookeville III explained:

Here the hospitals could not have been certain of being reimbursed. The Secretary's policy during the relevant period was not to include the expansion waiver population in the disproportionate share hospital adjustment. 65 Fed. Reg. at 3136. Although some financial intermediaries were including the expansion waiver population, many (including those in Tennessee) were not. The hospitals were thus on notice that the expansion population might not be included.

Cookeville III, 531 F.3d at 847-48. Further, St. Thomas does not claim that it took any action with the expectation that it would at long last receive reimbursement for the care provided for the fiscal year ending June 30, 1996, yet "the aim of the presumption [against retroactivity] is to avoid unnecessary *post hoc* changes to legal rules on which parties relied in shaping their primary conduct." Rep. of Austria v. Altmann, 541 U.S. 677, 696 (2004). That St. Thomas believes it might have had a better shot at prevailing prior to the enactment of the Deficit Reduction Act is simply not enough. See, Bellsouth Telecomm. v. Southeast Tele., 462 F.3d 650, 662-63 (6th Cir. 2006)(citation omitted)("'expectation of success in its litigation is not the kind of settled expectation protected by Landgraf's presumption against retroactivity").

24

Finally, the Court turns to the arguments raised by Adventist Health. In moving to file an *amicus* brief, Adventist Health asserts that "[t]he purpose of the brief *amicus curiae* is to assist the Court by presenting an analysis of the proper treatment of the TennCare 'expansion' waiver days that has not been addressed in the parties' brief." (Docket Entry No. 57 ¶ 5). It is not clear that Adventist Health's arguments should even be considered by the Court because "*[a]mici* cannot insert new arguments, not made by a party, into a case." Weaver's Cove Energy, LLC v. Rhode Island Coastal Res. Mgmt., 589 F.3d 458, 467 (1ˢᵗ Cir. 2009); see, Solis v. Summit Contractors, Inc., 558 F.3d 815, 827 (8ᵗʰ Cir. 2009)(declining to consider argument "because it was raised to this court by the *amici* and not by the parties"). In any event, the Court does not find Adventist Health's arguments compelling.

Adventist Health raises two somewhat overlapping arguments. First, the plain language of the Medicare DSH statute, which is defined by reference to the Medicaid statute in Title XIX, requires that the expansion waiver days be counted because the Secretary considers these patients to be eligible for medical assistance for purposes of Medicaid in Title XIX. Second, when the Secretary approved the TennCare waiver, she determined that the expansion waiver populations were eligible for medical assistance under Title XIX, meaning that the Secretary is bound by that same determination in this case.

In support of its first argument, Adventist Health relies upon another District of Columbia Circuit case, Adena Reg'l Med. Ctr. v. Leavitt, 527 F.3d 176, 179 (D.C. Cir. 2008), for the proposition that "eligible for medical assistance" should be construed for purposes of the Medicare DSH payment as it is construed for purposes of the Medicaid statute in Title XIX and, therefore, expansion waiver days must be included in the Medicare DSH calculation. But Adena preceded

25

Cookeville III and dealt with a different issue than that presented here – reimbursement for patients who were served by a state charity program not included as a Medicaid experimental project. Further, the Adena court did not cite, let alone discuss, the Deficit Reduction Act which was an important component of the decision in Cookeville III. In any event, Adena has been read as simply standing for the proposition that the "numerator formula" only includes federal Medicaid eligible patients. See, Univ. of Washington Med. Ct. v. Sebelius, 2009 WL 3185592 at *4 (W.D. Wash. 2009).

Adventist Health's second argument is that even if the Secretary had the option to exclude expansion waiver days in the DSH adjustment, she chose not to exercise that option. This is evident, Adventist Health submits, because in approving the TennCare waiver program the Secretary informed the state that " expenditures made by the State for [certain enumerated items] . . . shall, for the period of this project, be regarded as expenditures under the State's Title XIX plan." (Docket Entry No. 57-2 Ex. 2). The Secretary's grant was premised on the authority of Section 1115, and while a similar argument was successful in Cookeville I and Portland Adventist, this Court has already indicated its view that the decision in Cookeville III was correct. There, the District of Columbia Circuit considered the TennCare plan and ruled that while the statute provided that the costs of a demonstration project "shall" be regarded as expenditures under Title XIX, the statute "modifies the 'shall' by indicating that the costs are only treated as Medicaid expenditures 'to the extent and for the period prescribed by the Secretary'" and that this could "[p]lausibly" include "which costs or how much of the costs are to be treated as expenditures." Cookeville III, 531 F.3d at 848 (citation and footnote omitted).

26

## IV. CONCLUSION

Based upon the foregoing, the Court finds that (1) it lacks jurisdiction over St. Thomas' claim relating to unreimbursed Section 1115 patient days because it did not exhaust its administrative remedies; (2) St. Thomas is collaterally estopped from presenting the claim; and, in any event, (3) St. Thomas' claim fails on the merits.

Accordingly, the Court will grant the Secretary's Motion for Summary Judgment (Docket Entry No. 42) and deny St. Thomas' cross Motion for Summary Judgment (Docket Entry No. 34).

An appropriate Order will be entered.


ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

27